1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

8
9   SHARON LOUISE HENSLEY

10          Plaintiff,

11    v.

12   CAROLYN W. COLVIN, Acting
     Commissioner of Social Security,

13

14          Defendant.

Case No. 1:14-cv-00505-SMS

ORDER REVERSING AGENCY'S DENIAL
OF BENEFITS AND REMANDING
FOR FURTHER PROCEEDINGS

15
16          Plaintiff Sharon Louise Hensley seeks judicial review of a final decision of the

17   Commissioner of Social Security ("Commissioner") denying her application for supplemental

18   security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*)

19   (the "Act").  The matter is before the Court on the parties' cross-briefs, which were submitted,

20   without oral argument, to the Honorable Sandra M. Snyder, U.S. Magistrate Judge.

21          Plaintiff contends that the ALJ erred in two ways: (1) by concluding that Plaintiff's work as a

22   sample provider qualified as past relevant work when her earnings did not exceed the requisite level

23   necessary to characterize the job as substantial gainful activity, and (2) by accepting without analysis

24   the vocational expert's misclassification of Plaintiff's job caring for special needs students.

25   Following consideration of applicable law and the administrative record as a whole, the Court agrees

26   that the ALJ failed to articulate fully (1) his basis for treating Plaintiff's prior work as substantial

27   gainful activity and (2) his acceptance of the vocational expert's categorization of Plaintiff's prior

28   ///

1

work as a job title with highly dissimilar duties and requirements.  Therefore, the Court reverses the denial of disability benefits and remands for additional proceedings.

I.   **Procedural History**

On January 3, 2011, Plaintiff filed an application for supplemental security income, alleging disability beginning August 1, 2010.   The Commissioner initially denied the claims on May 26, 2011, and upon reconsideration, on August 18, 2011.  On October 5, 2011, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on May 10, 2012.  Edwin T. Kurata, an impartial vocational expert, also appeared and testified.

On September 14, 2012, Administrative Law Judge John C. Tobin denied Plaintiff's application.  The Appeals Council denied review on February 19, 2014.  On April 9, 2014, Plaintiff filed a timely complaint seeking this Court's review.

II.   **Factual Background**

A.   **Plaintiff's Testimony**

Plaintiff (born May 9, 1948) last worked in 2010 demonstrating products in supermarkets and warehouse club stores such as Costco.  She distributed product samples and sometimes cooked the product she was promoting.  She last earned significant income in 2007, when she earned about $3700.  Thereafter, she attended community college and worked part time, never earning more than $900 per year.  Plaintiff completed all requirements for an associate degree in history and political science except for math classes, which she was unable to pass because of a learning disability (dyscalculia).  Plaintiff had also previously worked as a teacher's assistant in a special education program.

Plaintiff experienced constant back, neck, and arm pain, which she treated with Aleve.  She had difficulty standing or sitting in a single position, ultimately experiencing pain, muscle spasms, and breathing difficulty.  The pain had become progressively worse and impaired her ability to sleep. In response to the ALJ's question, Plaintiff testified that since she supported herself on a social security check of $229.00 per month, she lacked the funds for prescription pain medication.

///

2

Although she still drove, Plaintiff had difficulty turning to look behind the car and depended on functioning side mirrors. At the time of the hearing, Plaintiff did not own a car and commuted by bus. Using the bus was difficult because of the walking required to and from the bus stop. Combined with her remote residence in Mojave, limited transportation interfered with Plaintiff's ability to secure affordable medical care.[1]

Plaintiff also had high blood pressure and diabetes. She was attempting to reduce her blood sugar level through diet so that she would not need to take insulin.

**B.    Disability Report**

In an undated disability report, Plaintiff stated that since her last report on June 21, 2011, her levels of pain had increased. She recently experienced an instance of unbearable pain that prevented her turning her head to the right. She had also begun to have recurrent pain in the toes of her left foot that occurred just after she went to bed and prevented sleep for about two hours until it subsided.

On March 26, 2013, Plaintiff reported that her stamina had decreased as she experienced increased pain in her neck, shoulders, back, and left arm. To prevent back spasms, which left her breathless and in severe pain, she needed to rest frequently. She was unable to secure regular medical care since the nearest free clinic was in Bakersfield, sixty miles away by bus. She had begun to experience dizzy spells but had no health insurance and lacked the funds to pay for necessary tests. She was also being treated for acid reflux disease and high blood pressure.

**C.    Medical Records**

On February 22, 2000, Plaintiff was treated at the emergency room of Antelope Valley Hospital. She had injured her back while lifting a child at work. The emergency room doctors diagnosed back strain and prescribed pain medication and referred Plaintiff to a workers compensation physician.

From 2002 to 2012, Plaintiff received primary care from the Antelope Valley Community Clinic. Initially, she was treated at the Care-avan mobile clinic. The administrative record includes

---

[1] Although a mobile medical clinic previously served Mojave residents monthly, the service succumbed to lack of financing. Thereafter, Plaintiff needed to travel to a clinic in Lancaster to obtain medical care.

1  treatment notes for twenty appointments, annually at first and monthly at the end.  Plaintiff's

2  diagnoses included high blood pressure (hypertension), obesity, anxiety, arthritis (and joint pain

3  generally), GERD, chronic neck and back pain, abnormal EKG, and type 2 diabetes.  Her treating

4  physicians consistently recommended weight loss through diet and exercise; Plaintiff ultimately lost

5  approximately thirty pounds.

6  On January 12, 2011, radiologist Marcelo Spector, M.D., noted that a chest x-ray revealed a

7  calcified aorta consistent with atherosclerotic disease.

8  On April 22, 2011, internist Kristof Siciarz, M.D., performed a consultative exam for the

9  agency.  Plaintiff identified her chief complaints to be back and neck pain, both of which had

10  affected her for many years, but had been exacerbated by a lifting injury two years earlier.  The

11  straight leg raise test was positive at sixty degrees.[2]  Dr. Siciarz diagnosed chronic neck and back

12  pain with mild limitation of range of motion in the back and discomfort when turning the neck;

13  hypertension; and diabetes.  He opined that Plaintiff could lift and carry fifty pounds occasionally

14  and 25 pounds frequently, and stand, walk, and sit for six hours in an eight-hour workday.

15  On April 26, 2011, William Goldsmith, M.D., a psychiatrist and neurologist, prepared a

16  psychiatric evaluation for the agency.  He noted that Plaintiff was a good historian and did not claim

17  psychiatric disability.[3]  Dr. Goldsmith, who diagnosed no psychiatric or personality problems,

18  opined that Plaintiff had a GAF of 60.[4]  He opined:

19  ///

20  ///

21

22  [2] The straight leg raising test is administered during a physical examination to determine whether a patient with low back pain has an underlying herniated disc.  The test is positive if the patient experiences pain down the back of the leg when the leg is raised.  *Miller v. Astrue*, 2010 WL 4942814 (E.D. Cal. November 30, 2010) (No. 1:09-cv-1257-SKO).

23  [3] The agency apparently considered the possibility of a mental health impairment because of a mention in a medical report of anxiety.  *See* AR 249.

24  [4] The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and occupational functioning on a

25  hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." *Id.* at 34.  The first description in the range indicates symptom severity; the second, level of

26  functioning. *Id.* at 32.  In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings. *Id.* at 33.

27  GAF 60 is at the top of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends,

28  conflicts with peers or co-workers)." *Id.* at 34.

4

> The claimant is a formerly high functioning woman with above average
> intelligence.  She stopped work because of her physical problems.  She is in need
> of a good medical work up and treatment.

AR 227.

Dr. Goldsmith concluded that Plaintiff was capable of performing understanding and

carrying out both simple and detailed and complex instructions.  Her ability to maintain

concentration, persistence, and pace was intact.  She remained able to work without special or

additional supervision.  Her ability to relate and interact with supervisors, coworkers, and the public

was slightly impaired, as was her ability to adapt to the stresses common to a normal work

environment.  Plaintiff was able to maintain regular attendance and to perform work activities

consistently.

P. Bianchi, M.D., prepared a physical residual functional capacity assessment on May 2,

2011.  Dr. Bianchi opined that Plaintiff could lift and carry fifty pounds occasionally and 25 pounds

frequently, and could sit, stand, and walk six hours in an eight-hour workday.

On May 23, 2011, Heather Barons, Psy.D., completed the psychiatric review technique,

concluding that Plaintiff had no medically determinable impairment.

Chiropractor Wayne Hodges, D.C., C.C.S.P., examined Plaintiff on April 20, 2012.  Dr.

Hodges, who had treated Plaintiff from 1997 to 2002, noted that Plaintiff had experienced cervical,

lumbar, and thoracic pain since the 1990s.  The pain was exacerbated by her injury in 2000.  Dr.

Hodges opined:

> The patient has a degenerative lumbar disc with likely stenosis which is
> aggravated with prolonged weight bearing.  She also has increased thoracic
> kyph[o]sis and degenerative spondylosis in the upper thoracic region.  There is a
> chronic myofascial pain syndrome with abnormal posture related to the anterior
> head translation which aggravates the cervical and thoracic spine structures
> causing cervicogenic pain.

AR 317.

5

On June 1, 2012, physician assistant Shimeaka Garrett conducted an initial health assessment of Plaintiff, who was transferring her care to National Health Services in Tehachapi.  Ms. Garrett noted that Plaintiff was uncomfortable in her chair and constantly readjusted her position.  Lab testing confirmed Plaintiff's diabetes and revealed high cholesterol levels.  Ms. Garrett and N. Avadalla, M.D., referred Plaintiff for an MRI of her neck and for spinal x-rays.

Mohamed Naheedy, M.D., reviewed Plaintiff's x-rays on June 27, 2012.  The thoracic spine x-ray revealed minimal degenerative changes, minimal scoliosis, and possibly mild osteoporosis. Cervical spine x-rays showed mild-to-moderate bilateral uncovertebral and facet hypertrophy from C3 to C7 with no foraminal impingement.  Dr. Naheedy opined that calcification in the right and left mid-neck suggested artery calcification.  Lumbar spine x-rays indicated moderate to severe disc degeneration at L5-S1 and minimal bilateral facet hypertrophy as well as minimal narrowing of the disc spaces at L4-L5 and L3-L4.

At a National Health appointment on June 28, 2012, Plaintiff reported dizziness and palpitations.  Ms. Garrett ordered a 24-hour Holter monitor and a CT of the brain.

In late June and early July 2012, radiologist Lawrence McNutt, M.D., interpreted the MRI results.  The MRI of Plaintiff's lumbar spine indicated mild degenerative disc disease at L2-L3 and L3-L4, and moderate degenerative disc disease at L4-L5 and L5-S1.  Although Dr. McNutt observed minimal degenerative change of the mid-thoracic spine, the spinal cord appeared mildly atrophic, measuring 5 mm. in diameter.  The cervical spine had mild degenerative change with a poorly characterized lesion in the spinal cord at C3.  Because the MRI had been performed without intravenous contrast, "the differential diagnosis is quite broad and includes both benign and malignant neoplasm, infection, posttraumatic change and even demyelinating disease."  AR 359.  Dr. McNutt recommended a follow-up exam with contrast enhancement.

///

///

6

### D.   Vocational Expert Testimony

Vocational expert Edwin T. Kurata testified that Plaintiff's past work included demonstrator in supermarkets (No. 297.354-010, light, SVP 3) and teacher aide II (No. 249.367-074, light, SVP 3).  Mr. Kurata noted that since Plaintiff was required to lift and carry the students to various locations within the school, she performed the teacher aide position as heavy.

For the first hypothetical question, the ALJ directed Mr. Kurata to assume a hypothetical person of the same age, education, and experience as Plaintiff, who could perform medium work with occasional stooping, kneeling, crouching, and crawling.  Mr. Kurata opined that the hypothetical person could perform Plaintiff's past work as a demonstrator and could work as a teacher aide as normally performed (light work).

For the second hypothetical question, the ALJ directed Mr. Kurata to assume the same hypothetical person described in the first hypothetical question, except that the second hypothetical person was limited to work at the light exertional level and needed to alternate sitting and standing on the half hour.  Mr. Kurata opined that the hypothetical person could not perform Plaintiff's past work and would have no transferable skills.  Because the ALJ considered the work available to the second hypothetical person to be determinable using the Grids, he did not ask Mr. Kurata to provide examples of jobs available in California or in the national marketplace.

## III.   Discussion

### A.   Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to

7

support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  The Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's."  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

## B. **Legal Standards**

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. See 42 U.S.C. § 423(d)(2)(A); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Id.*

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520; 416.920.  The process requires consideration of the following questions:

Step one:      Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:      Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:      Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:     Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:     Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

If a claimant is found "disabled" or "not disabled" at any step, the remaining steps need not be addressed.  *Tackett*, 180 F.3d at 1098.

At steps one through four, the claimant bears the burden of proof, subject to the presumed non-adversarial nature of Social Security hearings and the Commissioner's affirmative duty to assist claimants in developing the record whether or not they are represented by counsel.  *Tackett*, 180 F.3d at 1098 n. 3; *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).  If the first four steps are adequately proven, the burden shifts to the Commissioner to prove at step five that considering the claimant's residual functional capacity, age, education, and work experience, he or she can perform other work that is available in significant numbers.  *Tackett*, 180 F.3d at 1098; *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 3, 2011.  Her severe impairments were degenerative disc disease in the cervical and lumbar spine, diabetes mellitus, and hypertension.  None of these impairments alone or in any combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1 (§§ 416.920(d), 416.925, and 416.926).  Plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967 (c), except that she could only occasionally stoop, kneel, crouch, or crawl.  Plaintiff was able to perform her past relevant work as a demonstrator and teacher assistant.  (Having resolved the case as step four, the ALJ did not reach step five.)  Accordingly, the ALJ concluded that Plaintiff was not disabled.

///

C.    <u>**Past Relevant Work as Demonstrator**</u>

Plaintiff contends that, because her earnings as a supermarket demonstrator were minimal, the ALJ erred in treating it as past relevant work.  The Commissioner responds that even though Plaintiff earned little in recent years, her earnings within the last fifteen years were sufficient to support the ALJ's finding.

At step four, an ALJ must determine whether a claimant has the residual functional capacity to perform his or her past relevant work in light of his or her residual functional capacity.  20 C.F.R. § 416.920(f); *Lewis v. Apfel*, 236 F.3d 503, 515 (9th Cir. 2001).  A claimant's prior work is past relevant work "when it was done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. § 416.965 (a).  *See also Andry v. Colvin*, 2013 WL 5305903 at *3 (E.D. Cal. Sept. 19, 2013) (No. 2:12-cv-00746-KJN) (holding that a job constitutes past relevant work only if it was substantial gainful activity).

"Substantial gainful activity is work activity that is both substantial and gainful."  20 C.F.R. § 416.972.  "Substantial work activity is work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 416.972(a).  ""Gainful work activity is work activity that you do for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b).

The "primary consideration" in determining whether work is substantial gainful activity is the earnings from that work.  20 C.F.R. § 416.974(a)(1).  A claimant's earnings are "a presumptive, but not conclusive, sign of whether a job is substantial gainful activity." *Lewis*, 236 F.3d at 515.  Each year, the Social Security Administration determines the minimum monthly amount that a claimant must earn for his or her job to constitute substantial gainful activity ("substantial gainful activity amount").  www.socialsecurity.gov/ACT/COLA/sga.html (May 26, 2015).  A claimant's earning less

10

Case 1:14-cv-00505-SMS   Document 18   Filed 06/05/15   Page 11 of 16

than monthly substantial gainful activity amount gives rise to a presumption that he or she has not engaged in substantial gainful activity. *Lewis*, 236 F.3d at 515.

If the presumption applies, the burden of proof at step four shifts from the claimant to the Commissioner. *Lewis*, 236 F.3d at 515. The claimant is deemed to have carried his or her burden unless the Commissioner determines that the claimant has nonetheless engaged in substantial gainful activity based on substantial evidence. *Id.* Five factors are relevant in an ALJ's determination of substantial gainful activity despite low earnings: (1) the nature of the claimant's work; (2) how well the claimant performs to work; (3) if the work is performed under special conditions; (4) if the claimant is self-employed; and (5) the amount of time the claimant spends at work. 20 C.F.R. § 416.973. If the ALJ fails to identify any particular evidentiary or testimonial evidence to support the conclusion of substantial gainful activity despite earnings below the presumptive amount, the conclusion is not supported by substantial evidence and the district court must reverse. *Eksund v. Astrue*, 343 Fed.Appx. 228, 229 (9th Cir. 2009); *Aguirre v. Colvin*, 2013 WL 4718334 at *6 (C.D. Cal. Sept. 3, 2013) (No. EDCV 12-01378-MAN).

In her work history report, Plaintiff indicated that from 1990-2010, she worked as a demonstrator once weekly for four hours. See AR 157-AR 158. During that twenty-year period, Plaintiff also worked as a telemarketer (1984-1996), an insurance salesperson (1992-1995), and a teacher's assistant (1997-2000). As a result of her on-the-job injury, Plaintiff did not work from February 2000 until 2003.

According to the Commissioner's own report, prepared to determine whether Plaintiff had been employed for sufficient quarters to qualify for disability insurance benefits, the average monthly amount of Plaintiff's annual income exceeded the substantial gainful earnings amount in only three times in those 20 years: 1993,[5] 1997, 1998, and 1999. The three years within the fifteen-year look-back period (1997, 1998, and 1999) were the only full years in which she also worked as a

---

[5] In 1993, Plaintiff worked three jobs: insurance salesperson, telemarketer, and demonstrator.

11

teacher's assistant in special education programs for the Los Angeles County schools (before she was injured in February 2000).

The Commissioner concedes that from 2003 through 2010, when Plaintiff only worked as a demonstrator, her income never reached the substantial gainful earnings amount.  But the Commissioner argues that, by failing to provide evidence of her earnings as a demonstrator in 1997, 1998, and 1999, Plaintiff failed to meet her burden of proving that her earnings as a demonstrator in that three-year time period.

Although Plaintiff's income for 1997, 1998, and 1999 establishes a presumption that she engaged in substantial gainful activity during those years, the regulatory provisions are merely guidelines and "do not relieve an ALJ of the duty to develop the record fully and fairly."  *Corrao v. Shalala*, 20 F.3d 943, 948 (9th Cir. 1994) (quoting *Dotson v. Shalala*, 1 F.3d 571, 576 (7th Cir. 1993)).  *See also Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001) ("Although the burden of proof lies with the claimant at step four, the ALJ still has a duty to make the requisite factual findings to support his conclusion"); *Lewin v. Schweiker*, 654 F.2d 631, 634-35 (9th Cir. 1981) (holding that the hearing decision must include a statement of the facts on which the ALJ's conclusion is based so that a reviewing court may understand the decision's basis).

"Earnings can be a presumptive, but not conclusive, sign of whether a job is substantial gainful activity."  *Lewis*, 236 F.3d at 515.  The ALJ must address both the claimant's earnings and the remaining factors set forth in 20 C.F.R. § 416.973.  *Corrao*, 20 F.3d at 948.  In particular, the Court notes the limited nature of Plaintiff's employment as a demonstrator—only four hours weekly—and the absence of any evidence regarding the existence of such a position for sufficient hours to constitute substantial gainful activity.  *See, e.g., Clester v. Apfel*, 70 F.Supp.2d 985, 991-92 (S.D. Iowa 1999) (finding that substantial evidence did not support a conclusion that claimant's work delivering newspapers met the definition of substantial gainful activity).

The Court rejects the Commissioner's assignment to Plaintiff of the burden of producing evidence breaking down her earnings for 1997, 1998, and 1999, when the inclusion of detailed income information in the disability insurance analysis suggest that that the Social Security Administration had ready access to the necessary evidence. The ALJ has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Widmark v. Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). Satisfying the duty to develop the record is critical when the evidence is ambiguous or inadequate to allow for its proper evaluation. *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). The duty to develop the record fully and fairly includes developing the evidence needed to evaluate the claimant's earnings against the guidelines. *See Milton v. Schweiker*, 669 F.2d 554, 556 (8th Cir. 1982).

Having failed to analyze fully whether Plaintiff's employment as a demonstrator constituted substantial gainful activity in 1997, 1998, or 1998, the Commissioner's post hoc rationalization cannot prevail. In the absence of any evidence or analysis of Plaintiff's earnings as a demonstrator in 1997, 1998, and 1999, the Court cannot conclude that the ALJ's determination was supported by substantial evidence. Accordingly, the Court will remand the case for consideration of whether Plaintiff's 1997, 1998, and 1999 work as a supermarket demonstrator satisfied the regulatory requirements for substantial gainful activity. (Plaintiff does not address the question of whether her 1997, 1998, and 1999 work as a teacher's aide satisfied the regulatory requirements for substantial gainful activity. In the course of attributing Plaintiff's income to the two jobs at which she worked in those years, the ALJ is also directed to consider whether Plaintiff's work as a teacher's aide was substantial gainful activity.)

### D. Incorrect Occupational Identification

Plaintiff contends that since Plaintiff's work as a teacher assistant included no clerical duties, the ALJ erred in accepting the vocational expert's identification of her past work as Teacher Aide,

Clerical (DOT No. 249.367-074) and in concluding that Plaintiff could therefore perform her prior work as generally performed.  The Commissioner responds that the ALJ properly relied on the vocational expert's testimony.

The vocational expert identified Plaintiff's prior work as Teacher Aide II, defined as follows:

> Performs any combination of the following duties in classroom to assist teaching staff of public or private elementary or secondary school: Takes attendance. Grades homework and tests, using answer sheets, and records results.  Distributes teaching materials to students, such as textbooks, workbooks, or paper and pencils.  Maintains order within school and on school grounds.  Operates learning aids, such as film and slide projectors and tape recorders.  Prepares requisitions for library materials and stockroom supplies.  Types material and operates duplicating equipment to reproduce instructional materials.

Although the DOT categorizes Teacher Aide, Clerical (DOT No. 249.367-074) as light work, the vocational expert testified that Plaintiff performed the position as heavy work.  The hearing decision adopted the vocational expert's categorization and concluded that Plaintiff had the residual functional capacity to continue it as light work, the exertional level at which it is typically performed.  The exertional level of Teacher Aide II is not its only difference from the work that Plaintiff performed for the school district, however; Plaintiff's work included little or no clerical work, consisting of physical assistance of children unable to function independently, such as personal care, transferring a student to a walker, or lifting a 75-pound student on and off the bus. The hearing decision articulated no basis for the disparity between Plaintiff's prior work and the DOT description: the ALJ never questioned the vocational expert in that regard.

When occupational evidence presented by a vocational expert is inconsistent with the DOT, the ALJ must question the expert for a reasonable explanation for the disparity.  *Lee v. Astrue*, 2010 WL 653980 (E.D.Cal. Feb. 19, 2010) (No. 1:08-cv-01505-GSA).  If the ALJ fails to explore the disparity and the reasoning behind it, the Court is unable to determine whether substantial evidence supports the ALJ's finding.  *Id.*

///

14

The ALJ has the duty to set forth the underlying factual findings to support his conclusion at step four. *Pinto*, 249 F.3d at 844. The court explained:

> This is done by looking at the "residual functional capacity and the physical and mental demands" of the claimant's past work. 20 C.F.R. §§ 404.1520(e) and 416.920(e). The claimant must be able to perform:
>> 1. The actual functional demands and job duties of a particular past relevant job; or
>> 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.
> SSR 82-61. This requires specific findings as to the claimant's residual functional capacity, the physical and mental demands of the past relevant work, and the relation of the residual functional capacity to the past work. SSR 82-62.
>
> *Pinto*, 249 F.3d at 844-45.

In this case, the vocational expert and the ALJ considered only the exertional differences between the listing and Plaintiff's prior work, but disregarded the complete dissimilarity of the tasks to be performed. Particularly because the record includes no evidence of Plaintiff' having performed any prior clerical work, this error requires the Court to reverse the Commissioner's determination and remand for further proceedings.

The Court takes judicial notice of another DOT listing, Child Care Attendant, School (DOT No. 355.674-010), which appears to contemplate the type of work that Plaintiff actually performed:

> Attends to personal needs of handicapped children while in school to receive specialized academic and physical training: Wheels handicapped children to classes, lunchrooms, treatment rooms, and other areas of building. Secures children in equipment, such as chairs, slings, or stretchers, and places or hoists children into baths or pools. Monitors children using life support equipment to detect indications of malfunctioning of equipment and calls for medical assistance when needed. Helps children to walk, board buses, put on prosthetic appliances, eat, dress, bathe, and perform other physical activities as their needs require.

As part of his re-analysis of step four (and step five, if needed), the ALJ shall secure the supplemental testimony of a vocational expert regarding the propriety of characterizing Plaintiff prior work as Teacher Aide, Clerical (DOT No. 249.367-074) as opposed to Child Care Attendant, School (DOT No. 355.674-010), as well as any other appropriate job classification as the vocational expert may identify.

E.    **Harmless Error**

Because the hearing decision did not address step five, the errors at step four were

not harmless.

**IV.    Conclusion and Order**

The Court hereby REVERSES the Commissioner's denial of disability benefits to Plaintiff

and REMANDS this case for further proceedings as outlined above.  The Clerk of Court is directed

to enter judgment for the Plaintiff.


IT IS SO ORDERED.

Dated:    __June 4, 2015__                                      _____  __/s/ Sandra M. Snyder__
                                                                                UNITED STATES MAGISTRATE JUDGE

16